## OLIN *v.* TIMKEN.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF OHIO.

No. 36. Argued October 12, 15, 1894. — Decided November 19, 1894.

The fifth claim in reissued letters patent No. 9542, granted January 25, 1881, to Joseph Tilton and Rufus M. Stivers for a spring for vehicles, on the surrender of letters patent No. 157,430, dated December 1, 1874, is an expansion of the invention described in the original patent, and the reissue is thus invalidated.

Letters patent No. 197,689, granted November 27, 1877, to Henry Timken for improvement in carriage springs, are void for want of patentable novelty in the invention so patented.

Letters patent No. 239,850, granted April 5, 1881, to Cyrus W. Saladee for an improvement in spring-supports for vehicles, wagon-seats, etc., relate to a device which was anticipated by another invention made more than two years prior to the application for that patent, and reduced to practice prior to that application, and by other inventions named in the opinion of the court, and are void for want of patentable novelty.

THIS was a bill in equity, filed by Henry Timken in the Circuit Court of the United States for the Southern District of Ohio against Thomas D. Olin and Edwin D. Olin to restrain the infringement of three letters patent, namely, No. 197,689, granted to Henry Timken, November 27, 1877, for improvement in "carriage springs;" No. 239,850 to C. W. Saladee, April 5, 1881, for "road wagon;" reissue patent No. 9542,

granted January 25, 1881, being a reissue of patent No. 157,430, to Tilton and Stivers for improvement in "springs for vehicles," dated December 1, 1874. Complainant charged that these patents were capable of conjoint use with each other, and that defendants infringed them all. The answer set up want of patentability; anticipation; prior public use; noninfringement; that defendants had the right to manufacture the vehicle springs they made, under a patent, No. 246,571, granted to W. H. Stickle, August 30, 1881, reissued to the defendant Thomas D. Olin, August 21, 1883, as reissue No. 10,372, and which patent was owned by the defendants; also that the Tilton and Stivers' reissue was utterly void, because not issued for the same invention as the original patent, and for inventions not shown or described therein. The Circuit Court held the patents valid, and that the defendants infringed the single claims of the Timken and Saladee patents, and the third, fourth, and fifth claims of the Tilton and Stivers' patent, and entered a decree enjoining defendants and referring the cause to a master for an account, which resulted in a final decree for damages to the amount of $27,897.75, and defendants appealed. The opinion will be found in 37 Fed. Rep. 205.

*Mr. George J. Murray* for appellants.

*Mr. William M. Eccles* for appellee.

Mr. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

Appellants manufactured no buggies or vehicles of any kind, but purchased and made springs which were fitted on wooden bars to be attached to the vehicles, and sold such spring bars in the market and to manufacturers of vehicles. The claims of the three patents, on which appellee's suit was based, were to combinations relating to side-bar buggies and wagons, the side-bar gear and buggy body being elements of each combination. These patents are as follows:

1. No. 197,689, declared to be for "improvement in carriage springs," was granted to Henry Timken, November 27, 1877, upon application filed October 27, 1877. The drawings consisted of three figures: (1) a side view of a wagon body with a spring attached; (2) a bottom view of a wagon showing the spring; and (3) "a sectional end view thereof."

The latter figure is as follows:

The specification states:

"My invention relates to buggy and wagon springs; and it consists in the attachment of springs to the bottom of the body at the sides, and crossing the bottom of the body, and connecting with the side bars on the opposite sides of the body, as will be hereinafter more fully set forth.

"The annexed drawing, to which reference is made, fully illustrates my invention.

"A represents the hind axle, and A' the front axle, the latter having the usual head-block B. The hind axle A and head-block B are connected by side bars CC, in the usual manner. D represents the body of the vehicle.

"The body D is connected to the side bars CC by means of two springs, GG, composed of one or more plates near each end. These springs are fastened to the under side of the body D at opposite sides. The springs then cross each other, and their ends are pivoted or hinged in clips II, fastened to the opposite side bars, as shown.

"By this construction and arrangement of the springs I secure length of springs and elasticity of motion, and at the same time hanging the body low.

"What I claim as new, and desire to secure by letters patent, is —

"In combination with the side bars CC and body D, the springs GG, attached to the under side of the body at opposite sides, then crossing each other, and connected to the side bars on opposite sides, substantially as herein set forth."

2. No. 9542, reissue, dated January 25, 1881, upon application filed November 27, 1880, being a reissue of patent No. 157,430 to Tilton and Stivers, for springs for vehicles, dated December 4, 1874, upon application filed November 25, 1874.

The specification of the original patent read thus:

"The object of the present invention is to provide springs designed especially for buggies, carriages, and other light vehicles, which shall obviate all rocking motion of the body supported thereon, and cause the latter to be always maintained in a horizontal position when moving up or down, or when in a stationary position.

"The invention consists in the employment of two independent crossed-leaf metal springs, the ends of which are rigidly secured to the opposite ends of the cross-bar supporting the vehicle-body, each spring being formed or provided with a socket, and the two sockets meeting each other at the centre of the body-supporting bar, so as to enable an axis or pivot bolt to be passed through both sockets, for enabling the springs to turn thereon when the body is elevated or depressed. The invention further consists in securing a bearing and reënforcing plate of metal to the under side of the body-supporting bar, said plate being provided with pendent flanges at both ends, to serve as bearing-points for the ends of the springs, in order to prevent any lateral movement of the same, and to serve, in connection with fastening-bolts, to securely hold the springs in place.

\*          \*          \*          \*          \*

"It is well known that elliptic or semi-elliptic springs, secured to the centre of the cross-bar supporting a carriage-body, will permit the same to rock from side to side, which is objectionable for various reasons.

"I propose to maintain a buggy, carriage, and other vehicle

body always in a horizontal position in respect to the springs
and running-gear, and this is accomplished by employing a pair
of springs, A A, which may properly be termed sections of semi-
elliptic springs. The springs are arranged to cross each other
at the centre of the cross-bar B, upon which the carriage-body
is placed, and their elevated or upper ends are permanently
secured at the opposite ends of said cross-bars by means of
bolts and nuts *a.* Each spring is provided with a socket, *c,* at
the crossing point, and through said sockets, which are thus
brought in line with each other, an axis or pivot bolt, D, is
passed. A nut, *b,* is applied to the screw-threaded projecting
end of the bolt for securing the same in place. Each spring is
generally formed of two or more leaves — a long lower leaf
and a shorter upper leaf — this construction being resorted to
in order to obtain greater strength, and to enable the socket C
to be more readily formed."

*　　*　　*　　*　　*

The claims were as follows:

" 1. The combination of two springs, each composed of one
or more leaves, and hinged together at their crossing point,
and provided with an eye at one end to connect with the side
sills of the running-gear, and at the other end connected with
the cross-bar for supporting the body of the vehicle, substan-
tially as described.

" 2. The two leaf-springs, each provided with a socket at
their crossing point, in combination with a pivot or axis bolt,
substantially as described.

" 3. The combination of two springs side by side, and con-
nected together, with the side sills and cross-bar, for supporting
the body in a horizontal position between the side sills, sub-
stantially as described.

" 4. The reënforcing and bearing plate I, having end flanges,
in combination with the body-supporting bar and the con-
nected cross-springs, substantially as described."

The specification was amended in the reissue by substituting
" cross-piece attached to the body," for " cross-bar supporting
the vehicle body," " the body-supporting bar," or " bar sup-
porting the body;" and also by inserting after the word

"spring," in the line reading "each spring being formed or provided with a socket," the word "preferably," and after the words "spring is," in the line reading "each spring is provided with a socket, c, at the crossing point," the word "preferably."

The original claims were changed in the reissue by the substitution in the first claim of "cross-piece attached to the body," for "cross-bar for supporting the body;" and the word "cross-piece" for "cross-bar" in the third claim; and omitting the word "and" after "reënforcing," and the substitution of the "cross-piece attached to the body" for the "body-supporting bar," in the fourth claim; and a fifth claim was added as follows: "5. In combination with the body of a vehicle and the side sills or bars, the two springs crossing each other side by side and attached to a cross-piece, substantially as described."

3. No. 239,850, to C. W. Saladee for road wagon, dated April 5, 1881; application filed February 7, 1881. The claim is: "A spring-platform consisting of flexion springs arranged in pairs, the inner heavier ends of each pair being connected side by side to the central portion of the body or object supported, and the flexion portion of each spring curving downward from the centre and then upward to its connection with the frame, all substantially as set forth."

It will be perceived that the third claim of the reissued Tilton patent includes, as a necessary element, two springs side by side and connected together; the fourth claim includes the connected cross-springs and the reënforcing plate, having end flanges; while the fifth claim is substantially the same as the single claim of the Timken patent. Both have the two springs crossing each other, though in the Timken claim these springs must be connected at the heavier ends at the opposite side from which the light ones are connected with the side bar. It seems clear that the fifth claim was intended to cover sectional cross-springs without the articulated joint in the centre, and it does cover such springs, if the word "preferably," introduced for the first time in the reissue, is not an expansion of the invention described in the original patent; but we cannot concur with the learned Circuit Judge in his

conclusion that the insertion of that word did not unduly expand the original and so invalidate the reissue. The original patent made no reference to an alternative construction with the pivot bolt omitted, while the new matter made the connection of claims three and four, (which remained practically unchanged in terms,) if broadly construed, only a preferable mode. As the patent originally stood, the connection of the cross-springs was an essential element of the claim, but, if the reissue were valid, the bolt coupling the two springs together at their centre and forming an articulated joint would in effect be eliminated. The application for reissue was not filed until November 27, 1880, while the original patent was dated December 1, 1874, and the reissue was thus made by expansion to cover structures in public and common use between those two dates.

*Huber* v. *Nelson Manufacturing Co.*, 148 U. S. 270, is much in point. There one Boyle obtained a patent for a sanitary closet, including, as an essential element of the claim, a flushing chamber, and subsequently applied for a reissue for the purpose of eliminating that chamber, but this, it was held, could not be done.

The object of the original Tilton invention was declared to be to provide carriages or other vehicles with springs to prevent the rocking motion of the body supported thereon, and it was stated in the specification : " It is well known that elliptic or semi-elliptic springs secured to the centre of the cross-bar of the carriage body will permit the same to rock from side to side. It is objectionable for various reasons." It was proposed to remedy this by taking springs of the form shown, which might be properly termed sections of semi-elliptic springs, and arranging them to cross each other on the centre of the cross-bar upon which the body was placed, each spring being provided with a socket at the crossing point and a pivot bolt passing through both springs, secured by a nut, this coupling preventing them from moving independently of each other. In the first claim the words were used, " hinged together at their crossing point ; " in the second claim, " two leaf-springs, each provided with a socket at their crossing point ; " in the

third claim, "the combination of two springs side by side, and connected together, with the side sills and cross-bar, for supporting the body in a horizontal position;" while the fourth claim was for the reënforcing plate and connected cross-springs.

Appellee's contention that the connection of the crossed springs of the third and fourth claims is a connection by means of the reënforcing plate and its flanges, which, the specification says, were intended to serve as bearing points for the ends of the springs, described in the fourth claim as a separate element in combination with the body-supporting bar and the connected cross-springs, requires no comment.

The new fifth claim omits the crossing connection altogether and covers matter recognized as old in the original patent, and claims three and four, if broadly construed in connection with the new matter introduced in the specification, render the central connection non-essential, since it might be omitted, if preferred. There is no basis for the theory of inadvertence, accident, or mistake, and the reissue cannot be sustained.

As to the original patent, it should be observed that if the bolt passing through the sockets in that portion of the springs centrally under the body and coupling them together, as shown, were omitted, the result would be the Timken spring, and it involved no invention on the part of Timken to dispense with that connecting link, thus leaving the springs practically identical. It is true that the Tilton patent, both original and reissue, showed the light ends of the springs secured to the side bars by links or swinging shackles, while the shackles were rigid in the Timken, but both these shackles were well known, and complainant cannot contend that the difference is material.

In short, the Tilton patent relates to a crossing spring with a pivot bolt at the intersection. The Timken spring is the Tilton spring with the pivot bolt omitted, but in the defendants' spring the two sections do not cross each other, and cannot have a pivot bolt at the intersection.

Many different styles of cross-springs appear in the record, representing springs of all kinds and shapes; springs placed

longitudinally and transversely of the vehicle; springs with different fastenings binding them together at the crossing point; single sweep and double sweep springs; springs of wood and of steel; cross-springs of rigid metal; spring bars with semi-elliptic double sweep springs, etc. It is not disputed that the side-bar buggy or wagon, known as the Brewster side-bar vehicle, came into general use in 1873, and was made under a patent granted to Wood, May 27, 1873, No. 139,348, reissued August 18, 1874, No. 6018. The Wood invention consisted in altering a side-bar buggy having downward transverse springs over the axle in which the ends of the side bars rest on the ends of the springs, by putting in upwardly-curved springs transversely between the side bars and the body of the buggy, the claim being: "A frame, consisting of the longitudinal side-bars FF, downwardly-bowed end-springs EE, and upwardly-bowed metal springs GG, constructed, arranged, and applied as and for the purpose described." In the reissue the half springs in reverse were not a part of the combination, and the claim was: "The semi-elliptic springs GG, interposed between the side-bars FF, and the wagon body, all combined substantially as specified." The original and reissue were both held invalid by Judge Wallace in *Brewster* v. *Shuler,* 37 Fed. Rep. 785. Reference was there made to the semi-elliptic scroll ended springs which had previously been interposed between the side bars and the body of a buggy belonging to a well-known class used in carriages and sold by dealers as semi-elliptic springs, as appeared in the patent to George Groot of July 13, 1869, (one of the patents in evidence here,) for an improvement in carriage springs, which patent relates to the fastening of semi-elliptic springs transversely under the body of the carriage to side springs by means of saddle clips; and there being nothing in the Wood patent to indicate that a semi-elliptic spring of a special form was an element in the claim, it was held that the claim specified one of any well-known form adapted to be interposed between the side bars and the wagon body, and that therefore the patent was void for prior public use of semi-elliptic scroll ended springs, though the drawings showed springs without scroll ends.

The Steward patent of October 25, 1870, describes a semi-elliptic spring, whose ends are attached to the axle by means of two diagonal spring-braces which pass from the points of attachment to the semi-elliptic spring diagonally past each other to points near the journals of the axle, there to be secured by means of a sleeve and set screw or in some other suitable manner. The heavy ends are attached to the gear and the light ends to the semi-elliptic spring or spring-bar on which the vehicle rests, but obviously these springs could be interchangeably used for the springs shown in the Timken patent, and it would require no invention to attach them. There was no novelty in the means of accomplishing the result.

In Kenan's patent of September 13, 1870, No. 107,386, we find crossing springs coupled at the crossing point by solid balls or blocks of india-rubber. In Labaw's, No. 34,549, February 25, 1862, and Hubbard's, No. 12,890, May 15, 1855, the connection is effected by a pivot bolt. In Cooper's patent, No. 200,435, February 19, 1878, each spring is formed of two sections, lying side by side, the inner end or heel of each section being secured to the wagon body but a little beyond its centre, while the outer ends are secured to the side bars.

Catterson's English patent, No. 2642, May 15, 1854, shows cross-springs formed of two sections, lying side by side, pointing in opposite directions, provided at their ends with thin, flexible, curved portions, and there shackled.

The earliest patent in the record is the Manton English patent, No. 4092, dated July 18, 1817. This patent shows a rigid gear mounted on cross-springs having their heavy ends "attached to the under side of the body at opposite sides, then crossing each other and connected to the side bar on opposite sides."

The specification states : " My improvement in the application of springs to wheel carriages consists in placing the springs which are to support the body of the carriage in a transverse or cross-position, so that the length of the springs will be in a direction from side to side of the carriage, as represented by the drawings hereunto annexed, and that each spring shall be

fixed to the body or suspended part of the carriage on one side thereof by one end of the said spring, which spring shall extend crossways beneath the body of the carriage and be attached to the frame of the carriage on the opposite side to that side on which the other end of the same spring is fastened to the body of the carriage. This is shown in Fig. 1, which is a view of part of a gig body and the axletree to show the application of the springs. A is the axletree; BB blocks fixed on the axletree to support the shafts, which with their cross-rail CC form a frame. Upon this frame the body DD is placed. *ab* is one of the springs and *cd* the other. Both springs are bolted or otherwise firmly fastened to the under side of the body D at their thick ends *a* and *c*; the other ends *b* and *d* of the springs are received in shackles, loops, or links, which are suspended from the shafts or frame and allow the ends *b* and *d* of the springs some play. The same figure also shows clearly how the springs cross each other, but a sufficient interval must be left between the two springs, that they will not touch or rub against each other where they cross. The figure is taken at the hind part of the gig and similar cross-springs may be applied at the fore part. The springs are suspended by the shackles, loops, or braces in order that the ends of the springs may expand and contract — that is, advance to and recede from each other — when the body rises and falls by jolts and irregular motions. . . . The thick ends *a* and *c* of the springs are fastened to a bar, GG, on the ends of which bar irons H are fastened, and they go beneath the body DD of the carriage, and are firmly fastened thereto, so as to fix the bar G firmly to the body. . . . In some cases the springs may be fixed immediately to the body of the carriage, . . . and then, if there is sufficient substance of wood in the body or boot or wherever the springs are to be fastened, there will be no necessity for the bar G; but be it observed that the particular manner of attaching and affixing the springs in their places may be left to the discretion of the workman, who must adapt the springs, in respect to their dimensions, weight, strength, and mode of attachment, to their places, according to the particular kind of carriage to which they are

to be applied, for. I confine my improvement in the application of springs to wheel carriages to the placing of such springs in a transverse direction when one end of each spring is attached to the body of the carriage on one side, (for instance, the left-hand side,) and the other end of the same spring is attached by a shackle to the carriage or frame on the opposite side, (for instance, on the right-hand side,) the manner of which has been hereinbefore explained. In all cases the springs, being fixed fast at one end, must be suspended by a shackle at the other end to allow them play to expand or contract."

Figure 1, omitting the frame formed by the axletree, the shaft supports, and the cross-rail, is as follows:

The Manton specification covers a larger field than that of Timken, but the two devices are strikingly similar.

Passing to the question of prior use, the springs manufactured by Priest at Detroit, Michigan, show such anticipation of the alleged invention in the three patents in suit as seems to us quite decisive. The learned Circuit Judge, however, rejected the testimony of Priest as wholly unreliable; but in our view that testimony was so fully corroborated by other witnesses and documentary evidence, that we are constrained to arrive at a different conclusion, whatever might be said of it standing alone.

The first of the Priest springs is known as the Meisner spring. In 1872 or 1873, Priest manufactured a buggy for Dr. Meisner, which had a body coupled to the side bars by double sweep sectional cross-springs, rigidly secured to the buggy bottom at opposite sides by bolts passing through their thick ends, then curved downwardly from the body and up again in the direction of the side bars, to which they were coupled by swinging shackles or links.

The evidence of Priest and of one Rolfe, then a dealer in carriages, was to the effect that in 1874, Priest built a side-bar buggy on the order of Rolfe, who had contracted with C. W. Prescott to furnish a Brewster buggy for Lady Prescott; but during its construction Brewster's agent demanded a royalty, whereupon Priest used the Meisner spring, substituting the Brewster rigid shackle for the loose link.

Rolfe testified that the buggy was made in September or October, and was painted prior to December 1, 1874, and he produced the bill for the painting dated December 31 of that year ; also his invoice book showing the buggy on hand January 1, 1875, as well as entries afterwards of a buggy sold Sir George Prescott, and of several other buggies with Priest springs ; also bills of lading, dated March 25, 1875, from the Erie and North Shore Line, showing the consignment of the buggy to Lady Prescott, Strand Park, Herne Bay, Kent, England, one for the shipment from Detroit to New York, and another for the transportation from New York to London, April 10, by the steamer C. F. French ; also letter of C. W. Prescott, dated June 10, 1875, from Isenhurst, Hawkhurst, Sussex, England, showing that the buggy had arrived, and ordering another for Sir George Prescott ; and another letter of C. W. Prescott, without date, purporting to have been written from Lawrence, Kansas, with reference to the second buggy. The testimony of Priest was sustained, not only by that of Rolfe, but of Rand, who packed and superintended the shipment of the buggy to England. Rolfe's invoice book showed the buggy sold to Sir George Prescott, August 13, 1875, and also a Priest buggy to Dr. Drake on October 23, 1875. That the first Prescott buggy was made and shipped as contended, is satisfactorily made out, but the real question is as to the character of the springs upon it, and in respect of that Priest is corroborated by several witnesses.

Among the exhibits which Mr. Timken concedes in his evidence contain his invention, or are nearly the same as his springs, are the Matlock or Kierolf springs and the Kunkle Brothers' springs. The Kunkle springs were manufactured by one Ruple and sold to Kunkle Brothers in 1876 or the

spring of 1877, and the evidence tends to show that these springs were invented by Ruple in the latter part of 1875. He applied for a patent shortly after the allowance of the Timken patent and his application was rejected, but the specification and drawing of this application are given in the record, and show clearly the invention claimed in this suit. The Kierolf springs were made during the summer or spring of 1877. Matlock identifies similar springs as made in 1877. We think counsel for appellants justified in saying that these and other springs exhibited were made in view of the reissued Wood patent embodied in the Brewster wagon. What was known as double-sweep Concord springs were long enough to extend from the rear axle to the head block, and Brewster shortened these springs and extended them across from side bar to side bar. Subsequent inventors took these same Concord springs and instead of shortening them cut them in two in the middle and crossed them past each other, extending from the middle or one side of the buggy body to the cross-bar on the opposite side.

Timken made his application October 27, 1877, and the evidence on his behalf as to when he made his invention, which we have carefully examined, fails to show that it was earlier than the other devices to which we have referred.

Appellee's argument seems to be that the Timken patent should be so construed as to cover a double-sweep sectional spring, having the attaching ends connected to the bottom of the buggy or cross-sills at any point between the side and the centre, crossing the centre, bending downwardly for a distance and then upwardly to be attached to the side bar; having a thick end for attachment to the buggy bottom and a thin end for attachment to the side bar shackle, the curve being such as to allow the body to move up and down without expanding the side bar, but we do not understand this description to be within the terms of the patent, according to which the Timken invention consisted in the use of sectional springs arranged in pairs side by side and crossing each other to couple the body to the gear. Now that sectional springs can be used for coupling the body to the gear of the vehicle; that rigidity

of spring can be obtained by making the connections rigid; that the body could be hung either high or low by the proper sweep of the spring; that the form and sweep of the springs and various methods of using them as couplings between the gear and body, were well known, the patents, exhibits, and proofs make exceedingly clear; and we should say that nothing but mechanical skill was required to so adapt these well-known springs as to attain the desired objects expressed in complainants' patent. And while the patented article may have been popular and met with large sales, that fact is not important when the alleged invention is without patentable novelty. *Duer* v. *Lock Company,* 149 U. S. 216.

If, however, such a construction could be put on the Timken patent as would save it from being held invalid for anticipation or for want of invention, that construction would certainly exclude appellants' structure. The differences between them are well and accurately given by appellants' expert. Timken's sections have their heels attached at the sides of the wagon bed; cross the entire bottom to reach the opposite side bar; cross each other like the letter X, and have their heels fastened independently and far apart below the wagon bed, by bolts passing through perforations in the springs, the flexible portions of the sections comprising the entire distance between the shackle bar and the first attaching bolt. In appellants' structure the heels of the sections attach at about the centre of the wagon bed and do not cross the entire bottom to reach the opposite side bar; the sections do not cross each other; the heels are attached closely contiguous to each other, by a rigid clip, secured by bolts and clips, the flexion of the section being limited to a length extending from the shackle end of the section to a point some distance nearer the shackle end than the bolt perforation through the section.

As to the Saladee patent, in view of the state of the art as shown by the exhibits, all made more than two years prior to the application for this patent, which was February 7, 1881, and the fact that the proof shows that the defendants' springs are made in accordance with the Stickle patent, and that Stickle made his invention, and reduced it to practice, prior to

the application for the Saladee patent, we need spend no time upon it. Moreover, the Cooper patent No. 200,435, clearly anticipated Saladee's invention.

*The decree is reversed and the cause remanded with a direction to dismiss the bill.*