## VAN EPPS v. UNITED BOX BOARD & PAPER CO.

(Circuit Court of Appeals, Second Circuit. January 23, 1906.)

### No. 170.

1. PATENTS—VALIDITY—INCORRECT STATEMENT OF PRINCIPLES OF OPERATION.

Where a patent discloses means by which a novel and successful result is secured, it is immaterial whether the patentee understands or correctly states the theory or philosophical principles of the mechanism which produces the new result.

2. SAME—ANTICIPATION—DEVICES NOT PRACTICALLY OPERATIVE.

Where prior patents, or the machines constructed under them, embody the principle covered by a later patent, and sufficiently disclose the invention claimed therein, they are not deprived of their effect as anticipations by the mere fact that such machines are not capable of successful practical working, because of objections as to minor matters of detail in construction.

[Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, § 73.]

3. SAME—INVENTION—CHANGE IN FORM OR DEGREE.

It is not patentable invention merely to carry forward an invention shown in a prior machine by a change only in form, proportions or degree or the substitution of equivalents, doing substantially the same thing in the same way by substantially the same means but with better results.

[Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, §§ 20, 24.]

4. SAME—INFRINGEMENT—PULP SCREENING MACHINE.

The Victory patent, No. 417,451, for a pulp screening machine was not anticipated, and discloses a patentable invention of merit, but, as limited by the prior art and by the proceedings in the Patent Office, held not infringed.

Appeal from the Circuit Court of the United States for the Northern District of New York.

For opinion below, see 137 Fed. 418.

This cause comes here upon appeal from an interlocutory decree of the United States Circuit Court for the Northern District of New York, on final hearing, adjudicating the validity, and infringement by defendant, of claims one and two of complainant's patent No. 417,451, granted to Edmund Victory, December 17, 1889, for a pulp screening machine.

Francis T. Chambers, John C. Pennie, and Osgood & Davis, for appellant.

E. H. Risley, for appellee.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

TOWNSEND, Circuit Judge. The art to which the patent relates is that of separating, by means of sieves known as screen-plates, the fibrous particles and impurities in paper pulp, and of breaking up matted masses of the fibre. The screen-plates are slotted, and in the

machines herein discussed reciprocating plates, called bellows-plates, form the bottom of a chamber below the screen-plates.

The construction of the Victory screen is accurately explained in complainant's brief as follows:

"The machine has a supporting frame with a rectangular body-frame which has the series of parallel cross-bars forming the rectangular spaces. At the top of the spaces are secured the separate bellows-plates, the sides of which are connected to the cross-bar, while their ends are connected to the side pieces of the frame by flexible bellows-joints, of suitable material. In the lower part of the frame is mounted a longitudinal driving-shaft, * * * and upon this shaft, * * * are mounted a series of eccentrics, * * * connected to the middle underside of the bellows-plates by the frames. These eccentrics are arranged alternately, so that as the alternate eccentrics elevate the alternate bellows-plates to which they are connected, the other alternate eccentrics will lower the alternate bellows-plates to which they are connected. * * * At the outer edges of the strips which run around the top of the frame, is secured a rubber packing, or other suitable material, while the strips extend along the center of the top of the cross-bars to which they are secured ·by nails or screws, and along both their sides are secured packing strips of rubber or other suitable material. There is a top to the machine. * * * The top or vat has cross-bars, which register with the cross-bars of the body-frame, and the screen-plates are secured on the top of the cross-bars, as shown, with their side edge meeting on the cross-bars. The top and body have opposite apertured lugs through which screw bolts pass, having ·nuts on their ends, and it will be seen by tightening these screw-bolts, the top will be locked tightly down, the top and its cross-bars pressing down firmly on the packing and around the ends and sides of the bellows-plates, thus separating each bellows-plate by air-tight joints extending entirely around it, and rendering each bellows and the screen-plate above it entirely independent of all the others. (The patentee says:) 'This is an important feature of my invention.' The top of each bellows-plate is covered, and each bellows is formed with a central opening from which a short pipe leads down into a box, which is secured longitudinally beneath the center of the cross-bars. The lower end of these pipes terminate about the distance above the bottom of the box shown and they are always sealed by water and paper 'stuff' in the box, above which they never rise.

"In operation it will be seen that as the driving shaft revolves the bellows-plate, each having its separate eccentric, will be moved up and down alternately as before described, the bellows-joints permitting this movement, and, as the packing around each bellows separates it completely from the other when the top is fastened down by the screw-bolts, it will be seen that each bellows will operate independently of all the others and draw the paper stuff which flows upon the screen-plates above it down through the screen-plates.

"The paper pulp is thus drawn down through the screen-plates upon the concave face of the independently-working bellows, and passes down through the central openings and pipes into the longitudinal box from which it may be discharged through pipes or in any other suitable manner: 'I do not wish to confine myself to the discharge pipes here shown, as I may employ any other well-known means for effecting the same purpose.'"

And the contention of complainant is as follows:

"Victory * * * took some of the independent mechanical elements, old in the prior art when separately considered, and made a new and useful combination, which met the pressing needs of the wood pulp industry and solved existing troubles in the screening of wood pulp. Victory's type of screen has driven out of use all prior types of screens by doing more and better work than was ever before accomplished in the manufacture of wood pulp into paper. The spirit—the very core of Victory's invention consists

in the division of the space under a given screening area into separate, isolat-
ed, expanding, and contracting chambers, in which, at all times, there is
present a sufficient quantity of air to permit of the expansion and contrac-
tion of the isolated chambers, so that by the expansion of the separate cham-
bers a powerful suction is exerted on the stock covering the screen-plates,
and when the chambers are contracted the air and stock in the chamber
is forced upwardly through the slots in the plates with the force of an ex-
plosion, thereby removing all slivers and obstructions drawn into the slots
by the down suction. The combination of mechanical elements expressed in
claims one and two of the patent revolutionized the wood pulp paper screen-
ing industry more than any other single factor and made cheap paper pos-
sible."

The so-called Gotham screen, one of the alleged infringements, is
the nearest to the patented construction. It is admitted that these
screens "are like the Victory screens in having the space beneath the
screen-plates divided up into a number of separate and independent
compartments, separated from each other by air-tight partitions, and
each provided with a vibrating diaphragm forming a part of its bot-
tom." But there is only one compartment below each pair of screens,
which compartment is only partially divided into two sections by a
cross-bar, and, therefore, not "rendering each bellows and the screen-
plate above it entirely independent from all the others, * * * an
important feature of my invention." The so-called "bellows-plates"
are not dish-shaped. Rubber strips are fastened to the top of the
bellows-plates, as in the prior art, but there are no bellows-joints
secured to the sides and ends of the bellows-plates. Gotham screens
have a different, and apparently more practical and effective, driving
mechanism, and a different, and claimed to be an improved, arrange-
ment of a flow box, which dispenses with the forked connecting frame
of the patent.

The claims in suit are as follows:

"(1) In a pulp-screening machine, the combination of the series of separate
screens, 18, the series of independent bellows-plates, 5, having the flexible
bellows-joints, 6, at their sides and ends, the drive-shaft, 7, having the ec-
centrics, 8, 9, alternately arranged upon it, and the connecting-frame, 10, sub-
stantially as set forth.

"(2) The combination, in a pulp-screening machine, of the body-frame, 2,
having the parallel cross-bars, 3, the series of independent reciprocating
bellows-plates, 5, having the flexible bellows-joints, 6, at their sides and ends,
the flexible packing-strips, 13 and 14, extending around the ends and sides of
each bellows, and the top, 15, having the series of parallel cross-bars, 17,
and the screen-plates, 18, substantially as set forth."

The other machines complained of are those known in the trade as
the "Success," "Packer," "New Success," "New Packer," "Monarch,"
and "Wells" screens. The Packer, Success, Monarch, and Wells
screens do not differ substantially from the Gotham construction. The
New Packer and New Success machines do not infringe the second
claim because, inter alia, "the screen chambers lying beneath the
plates and above the vibrating diaphragms are not separated from
each other by tight partitions;" they use a continuous sheet of rub-
ber as a vibrating diaphragm, thus dispensing with the "bellows-plates,
5" and "the flexible bellows-joints, 6, at their sides and ends;" they
do not have "the flexible packing-strips, 13, and 14, extending around

the ends and sides of each bellows," as claimed, and, therefore, not "thus separating each bellows-plate by an air-tight joint extending entirely around it, and rendering each bellows and the screen-plate above it entirely independent from all the others."

The contention of complainant that pulp stock lodging between screen chambers so constructed as to be in free communication with each other throughout the whole vat, is the equivalent of these specifically limited "flexible packing-strips, 13 and 14," described as "the packing completely around each bellows (which) separates it completely from the others," because the patentee stated that said packing-strips might be of "rubber or other suitable material," is without merit, and does not require discussion. If, in the operation of a machine constructed without such strips, the pulp stock performs the function of sealing and separation, then there is no useful function assignable to or resultant from the provision of such strips.

Much of the evidence in this case is devoted to a discussion as to whether the Victory patent is predicated upon an erroneous theory of pneumatic operation by means of air constantly present beneath the screen-plates alternately pumped up and down through the slots in the screen-plates and causing a powerful downward suction of pulp into the chamber. The conflict of evidence on this point, based upon conflicting theories and practical experiments, leaves the question in doubt. We have not found it necessary, however, to determine this question or the subsidiary question as to whether defendant's screens are pneumatic or hydraulic in their operation.

The language of the patent fails to state any theory of the patentee as to the presence of air below the screen-plates. But where a patent discloses means by which a novel and successful result is secured, it is immaterial whether the patentee understands or correctly states the theory or philosophical principles of the mechanism which produces the new result. Walker on Patents, § 175; Dixon-Woods Co. v. Pfeifer, 55 Fed. 390, 5 C. C. A. 148; National Meter Co. v. Thomson Meter Co. (C. C.) 106 Fed. 531, 538. It may be assumed, however, in the disposition of this case that the patentee proceeded upon the pneumatic theory and that this theory was correct, and that the "important feature" of the Victory invention, the independent air-tight construction, upon either theory of operation was a patentable improvement upon the devices of the prior art.

The patentee originally claimed his invention broadly in the following claims:

"(1) In a paper screening machine, the combination, with a series of screen-plates, of a series of independent bellows working beneath said screens; substantially as set forth.

"(2) In a paper screening machine, the combination, with a series of screen-plates, of a series of alternately reciprocating bellows; substantially as set forth.

"(3) The combination, with the series of screen-plates, of the independent bellows, the drive-shaft having the series of eccentrics alternately arranged upon it, and the connecting frames; substantially as set forth.

"(4) The combination, of the body frame having the cross-bars, the reciprocating bellows-plates having the bellows-joints, the packing around

each bellows, and the top having the cross-bars and the screen-plates; substantially as set forth."

They were rejected on Kron patent, No. 315,420, and were canceled, and the claims in suit were substituted therefor. The Kron patent shows two longitudinally arranged chambers provided with pulsating diaphragms alternately actuated. It does not show the details of construction of the Victory patent, such as the parallel cross-bar air-tight arrangement with packing-strips. In view of the marked differences in construction, it is questionable whether the applicant Victory, instead of canceling, might not have so amended, the rejected claims, especially the fourth, as to differentiate them from the references cited, and still protect some of the broader elements of his invention. But, however that may be, he acquiesced in the action of the Patent Office, and elected to substitute the present narrow claims in suit, and is now estopped to so expand them as to embrace the rejected subject matter. Whether such limitation would have been required upon a full survey of the prior art will be discussed later.

Defendant's expert, Dayton, names as the three closest references to the patent in suit the Richardson & Glenny British patent, No. 4,669 of 1880; the "Engineer No. 1," showing, in 1887, the construction then made under the Miller British patent, No. 3,620 of 1880; and the United States Russell & Cragin patent, No. 359,543 of 1887:

The Richardson & Glenny patent is for an improved strainer for paper pulp. The patentee describes and illustrates a strainer fixed in an inclined position in a vat, provided at its bottom with "a disc and diaphragm of india rubber or other flexible material, and a rapid reciprocal motion is given to the disc by means of a connecting rod and crank working from a revolving shaft." The patentee, stating that "the finished pulp' passes through the strainer by the aid of the action of the disc and diaphragm, * * * and the strainer is self-clearing," says:

"It is most convenient and effective to use two or more similar strainers, and for the stuff to flow over the surface of one of them onto that of the next, and so from one to another till all the clean pulp has passed through, and all foreign matter is strained out or separated."

Thus the patent showed a strainer divided into two sections, each having its separate diaphragm. These sections were separated from each other by a cross-partition, so as to be independent one of the other. The diaphragms or bellows-plates were connected with the top edge of openings into the sections by a flexible india rubber gasket, and so connected to the driving mechanism as to enable one of the diaphragms to rise while the other was descending. The openings from the vat were regulated by valves, so used to regulate the outflow that "the level of the stuff in the vat may be regulated and maintained at the level at which the strainer works most efficiently." The patentee, referring to the inclined position of the plates, says that those on the second chamber "may be placed level or slightly inclined." Complainant asserts that this patent does not show a series of parallel cross-bars forming the rectangular spaces, nor the bellows-plates at the top of these spaces, as specifically described and claimed in the patent in

suit, nor its specific driving-shaft construction, nor the air-tight cross-bar construction.

Counsel for complainant says:

"The change of the bellows-plates from the bottom to the top of the frame body reduces the sizes of the expanding and contracting chambers and increased materially the efficiency of the suction, and the size and shape of the bellows-plates are different in the Victory invention."

It may be assumed that this statement is correct.

There is a direct conflict of testimony as to whether experimental machines, claimed to be constructed under the Richardson & Glenny. patent, were capable of successful practical operation. The time-worn allegations of painstaking efforts to construct and operate, resulting in utter failure, are met by the conventional counter allegations directed to showing that the prior machines were better than those of the later invention claimed in the patent in suit. There is evidence tending to show that some unwarranted additions were made to the Richardson & Glenny experimental machine constructed by defendant, which largely contributed to its successful operation, and that the so-called Richardson & Glenny machine experimented with by complainant was unwarrantably so constructed that it could not possibly work. It is claimed by defendant that machines made under this patent were manufactured and sold in 1882 and for many years thereafter, while complainant's witnesses testify that the Richardson & Glenny machines used in the Remington factory were not practically successful and were discarded. In view of this conflict of testimony it is impossible to certainly determine the extent of the bearing of these machines on the patent in suit. But, even if the work done by the screens was unsatisfactory, it may be fairly assumed that the chief trouble was, as stated by complainant's witness, Remington. He testified as follows:

"They screened the stock very nicely, but we put only a small quantity through them. Q. 23. What was the reason for discarding the further use of these screens? A. The quantity we could get through them was so small."

In these circumstances, the rule frequently invoked in the case of mere paper patents may with much greater force be applied to these machines, which, even though they may have worked imperfectly, were confessedly capable of a limited, successful, practical operation. Where such patents, or the machines constructed under them, embody the principle covered by a later patent; the mere fact that they are not capable of successful practical working because of objections as to the minor matters of detail in construction will not deprive them of their effect as defenses where they sufficiently disclose the invention claimed in the later patent. Pickering v. McCullough, 104 U. S. 310, 319, 26 L. Ed. 749.

Engineer No. 1 publication illustrates and describes machines constructed under Miller British patent No. 3,620 of 1880. These machines show an arrangement of devices similar to those in Richardson & Glenny, but designed to effect the screening by "producing a disturbance which causes the stuff to pass through the slits." There is no suggestion or construction implying the idea of utilizing suction in

their operation. Nevertheless, the Miller machines, which were practically and commercially successful, serve to closely limit the Victory patent, and their manifest bearing upon its status are not disposed of or seriously affected, save in the particulars noted above, by the criticisms of complainant's expert.

The Russell & Cragin patent, No. 359,543, shows a construction embodying every element found in the patented construction in suit, except the diaphragm and joints. The space beneath the series of horizontal screen-plates is divided by transverse partitions into separate chambers, provided with separate agitators or pumping bars. The upper and lower sections of the vat, hinged as in Victory, contain upper and lower cross-bars, as in Victory, having packing strips thereon, and the discharge passages all deliver into a common flow box. The patentees say:

"B B represent the stationary bars or partitions between the pumping bars, A. These partitions we now provide with longitudinal indentations or channels, C in their tops, and secure to the underside of the screen, C, strips, D, of wood or metal, or other suitable material, coinciding with the channels of the partitions, and fitted closely thereto, so as to form a tight joint and support the central portion of the screen, and at the same time form a separate and distinct compartment for each pumping bar, thereby further increasing the efficiency of the pumping apparatus under the screen."

Complainant's expert's criticisms of this patent are that the pumping bars cannot pump, but are mere agitators, and that there can be no air space between the plates. The second point is immaterial in the view we have taken as to the hydraulic and pneumatic theories; the first point is met by the presence in the art of the vibrating diaphragms, shown in the patents already discussed, and by the description and illustration of the two means in Wise British patent, No. 14,101, and their description as equivalents in Kron patent, No. 14,603.

It is unnecessary to further examine this branch of the prior art. The screen machines chiefly in use in this country prior to the Victory invention were the Knocker, Bremaker & Moore, Gould, and Black & Clausen. Of these the Bremaker & Moore screen, described in Bremaker patent, No 242,428, may be selected as the most important and best type, and will be discussed because of its continuous practical, successful, commercial operation, and also because defendant's screens approach it in construction. This machine belongs to the old type of single chamber and single diaphragm screens. The screen-plates were supported on transversely extending cross-bars, concave on their lower sides, corresponding to the number of screens. The whole space below the cross-bars and above the single diaphragm plate was open, by reason of said concave construction, so that there was free communication throughout. The diaphragm was operated by driving mechanism substantially like that used by defendant. In operation the pulp was shaken through the slots in the screen-plates by the vibration of the diaphragm. It may be noted in this connection, with Bremaker using one compartment and one diaphragm, and defendant using two compartments and one diaphragm, that the much discussed air-tight suction theory applies to each, it being only a matter of degree, and in multiple each acting as one did before.

Complainant's criticisms of these screens are as follows: They "required a special foundation"; they were expensive to install; they were noisy in operation; they required frequent repairs and were slow in operation; * * * no means were provided for producing suction; * * * if at times a suction could be obtained, it was liable to be instantly lost by the irregular flow of the stock."

Complainant's counsel admits that these machines did "good work, though very little." And complainant's witness, Warren, testified as follows:

"In reference to the Bremaker & Moore screen, would say that I consider this practically among the class of diaphragm screens and not subject to so much of the imperfections which are referred to above. * * * In. this respect I consider the Bremaker & Moore closely approaches the Gotham screen. Under similar conditions, I would not say it would make more or less lumps than the Gotham screen."

The insufficiency of the foregoing criticisms will further appear from the admissions of complainant's witness, Remington, quoted below. Counsel for complainant, having asserted that the Victory screens were immediately adopted, and have since been successfully used and have displaced all older types, gives 10 reasons for this alleged situation, as follows:

"First. Because Victory's type of screens was unlike any prior screens shown, or described, in that it consisted of a new and useful combination of elements which separated the space under a series of horizontally disposed screen plates, into a series of separate independently operated, air-tight, expanding and contracting chambers crosswise of the vat and located above the horizontal top of the frame, beneath the plates; each independently expanding and contracting chamber, operated upon by a rigid bellows-plate of nearly the size of the chamber, operated crosswise of the length of the vat, whereby a series of partial vacuums were produced immediately under the plates and a series of propulsions of stock and air through the slots of the plate, so that the whole screen area covered with stock is operated upon by suction and blast, and when any portion of the plates run dry only the chamber under the dry screen plate is inoperative, and the instant when the plate is covered the chamber resumes its normal work.

"Second. They removed the string, slime, spots, and defects from web and book paper.

"Third. They cost, to install, about one-third of the cost of prior types of screens.

"Fourth. They screened twice as much stock, and do their work better than the older types of screens.

"Fifth. They required no special solid foundation.

"Sixth. They effected a great saving in repairs.

"Seventh. They made little or no noise in operation.

"Eighth. They required less attention to keep in order; the plates needed cleaning but once per week, while prior types required cleaning every day.

"Ninth. They saved a great amount of power.

"Tenth. They required no special attention while in operation."

The record establishes beyond contradiction the incorrectness of these assertions to any extent which would permit an enlargement of the scope of the claims to embrace defendant's screens. In fact, most of the assertions material to the question of scope may be disposed of by the evidence of complainant's witnesses or undisputed facts. That

the Victory screen, as made under the patent, was not a success, appears, inter alia from the evidence of complainant's witness, Remington, who testifies as follows:

"X-Q. 155. You were asked to state, as I understand it, whether you thought paper produced on the old Knocker screens, the Gould screen, the Black & Clausen screen, or the Bremaker & Moore screens would be salable to-day in the market on equal terms with paper produced from pulp treated by the Gotham type of screens. I will now ask you whether you believe that the so-called Victory screen made by Gotham could be used to produce paper salable in the market in competition with the screen known as the Gotham screen made by him after the termination of the verbal agreement and in use to-day?

"A. I don't think it could. The Victory screens were never used to any great extent on paper machines.

"X-Q. 156. You did try to use them, did you not, and then relegated them to the pulp mill? A. Yes.

"X-Q. 157. The fact that these Victory screens had separate compartments did not save them from being ineffective for work on the paper machine, did it? A. No.

"X-Q. 158. Nor the fact of the movement of the diaphragms alternately in action? A. It did not.

"X-Q. 159. As I understand it, the so-called Victory screens made by Gotham had a separate diaphragm for each screen-plate. Is that correct? A. Yes.

"X-Q. 160. But when you came to build them, after he had given up his license, you provided a diaphragm for each pair of adjacent screen plates. Is that so? A. Yes. * * *

"X-Q. 177. Did you make any profit out of these screens last referred to? A. No.

"X-Q. 178. Did you not conclude that there was no money in making and selling the Victory screen? A. There was no money making them the way we did. * * *

"R-D. Q. 222. The only trouble with the Victory screens in using in connection with paper machines was the fact that the screen had a little too strong suction. Was not that it? A. Yes.

"R-D. Q. 223. And when you enlarged the separate compartments so as to include two screen-plates for each bellows-plate, was there any further trouble with the use of those screens in connection with paper machines? A. We never tried them on a paper machine. It would not have made any difference."

As to the first point. The complainant's description of the Victory construction omits the specific limitations, stated and imported into the claims in suit by reason of the file wrapper and specifications and from the prior art, whereby defendant's construction is differentiated from said claims. This appears from the discussion of the claims and of defendant's screens in the earlier part of this opinion.

The second point may be disposed of by the testimony of complainant's witnesses, Warren and Remington, quoted above, and by Remington's further testimony as follows:

"X-Q. 197. Do you consider that the imperfections in paper due to knots, slime spots and 'strings' are diminished because of the subdividing of the compartments below the screen-plates into separate compartments? A. I don't know that that would make any difference.

"X-Q. 198. Or to the fact that one diaphragm goes up while its neighbor is traveling downward? A. I don't think that would make any difference.

"X-Q. 199. Suppose all of the compartments of a Gotham screen, except one, were out of action and the diaphragm of the single remaining compartment were operated, would you get the same quality of pulp in that single department? A. I think you would.

"X-Q. 200. All of the compartments operate in the same way, do they not, in so far as the avoidance of imperfections result in the paper are concerned? A. Yes, I think so.

"X-Q. 201. You have no doubt of it, have you? A. I have no doubt."

As to the third point, one of complainant's witnesses testifies that the Gould screens, which "ran fairly well," were "well built and not very hard to keep in repair."

As to point four, it would seem from complainant's evidence that even if the Victory screens did more work, it was not necessarily better work.

Disregarding, for the purpose of this inquiry, all of defendant's evidence, we may assume the correctness of complainant's other contentions, that the Victory machine was cheaper, did more work by enlarging the bellows-plates to nearly the size of the chamber, required less repairs and attention, was less noisy, and used less power than those of the prior art. But even if it be further assumed, which certainly is not satisfactorily proved, that these results are due to the constructions covered by the first and second claims of the patent, it is clear that these constructions are not used by defendant. The complainant's specific air-tight construction may have contributed to the efficiency of the machine, but defendant secures its results by a different construction; the comparative noiselessness and prolonged life and saving in foundation and repairs, would seem chiefly to be the results of avoiding shock by the substitution of a modified construction of the old diaphragm for the old agitator, while defendant does not have the patented diaphragm, "rendering each bellows and the screen-plate above it entirely independent from all the others." It is not invention to merely carry forward an invention shown in a prior machine. "A change only in form, proportions or degree, the substitution of equivalents, doing substantially the same thing in the same way by substantially the same means with better results, is not such invention as will sustain a patent." Smith v. Nichols, 21 Wall. 112, 119, 22 L. Ed. 566; Ansonia Brass & Copper Co. v. Electrical Supply Co., 144 U. S. 11, 12 Sup. Ct. 601, 36 L. Ed. 327. We conclude, therefore, that the advantageous results asserted on behalf of such elements of the patented construction as are covered by the claims in suit either "fall within the category of degree," or are due to details of construction not used by the defendant.

Thus far the questions at issue have been discussed chiefly in the light of the testimony of complainant's witnesses and the undisputed showing of the prior art. In view of the insufficiency of the testimony to support the assertions made in support of the patent, and its negative character as to the prior art, we are brought to a consideration of the latter as testified to by defendant's witnesses, who are practical paper manufacturers of long and extensive experience. They testify to the continued, actual, practical, successful use for years of

more than a hundred suction diaphragm screens, some with single compartment single diaphragm screens, others with diaphragms divided into several parts, some of which are in use at the present time. They assert that the single diaphragm screens screened just as well, made just as good paper, had as strong suction, and required only the same foundations as the multiple screens. Hall, one of defendant's witnesses, sums the matter up as follows:

"All conditions being equal, I should say there was practically no difference between the workings of single compartment single diaphragm screens and the multiple compartment multiple diaphragm screens."

In this connection it must be noted that the evidence of complainant shows that the various new types of separate compartment suction screens have in large measure displaced the older type, and are now generally used in the wood paper pulp industry. Defendant contends, however, that this change is due, not to the adoption of the characteristic features of the Victory construction, but to an avoidance thereof, and the substitution of noninfringing features. How far this contention is justified by the facts shown it is unnecessary to determine. It is sufficiently proved that the old screens were and are practicable, and that, even if the screens originally constructed under the Victory patent were impracticable, the defects have been remedied, and machines constructed along the lines of his patent are now a practical commercial success.

Counsel for complainant, referring to the testimony of her witnesses, says as follows:

"All these witnesses agree that paper could not now be made and marketed, were the old screens to be used, on account of the damaged quality of the product. This evidence is wholly uncontroverted."

But he fails to point out what has been shown above, that the same criticism applies to the original Victory screens, before the introduction of the later improvements. An exhaustive examination of the record, and careful consideration of all the arguments herein, in view of the importance of the questions involved, compels the conclusion that the Victory conception was a meritorious one, and not justly subject to the criticisms belittling the status of the invention. We conclude that the Victory patent disclosed a novel and more simple and economical construction, which materially contributed to increased efficiency and possible superiority of product, and substantially advanced the pulp screening art. It was new in Victory to use bellows-plates with concave tops, having bellows-joints secured to their sides and ends, flexible packing-strips, such as he describes, and forked connecting frame. And Victory departed from the prior art not only in these details of construction, but also by placing a diaphragm up between each pair of cross-bars, thus effecting a division of the spaces into separate, isolated, independent pumping chambers.

Therefore, every assumption has been made, and every doubt has been resolved, in favor of the patent, so far as this was justified by the record. But, even in this view, we cannot ignore the self-imposed limitations of the claims in suit, justified, if not required, by the prior

art. The defendant, by the elimination or modification of the claimed details of the patented construction, and a readjustment of relative size and location of supporting bars, diaphragms and flow box, either permissible by reason of the disclosures of the prior art, or not covered by the claims in suit, has succeeded in constructing a noninfringing machine.

The decree of the court below is reversed, with costs of this appeal, and the court below is directed to dismiss the bill, with costs.