SUNDH ELECTRIC CO. v. INTERBOROUGH RAPID TRANSIT CO.

(Circuit Court, S. D. New York. June 27, 1911.)

No. 3–64.

1. PATENTS ☜61—ANTICIPATION BY OTHER PATENTS.

A later patent is not of the prior art, and cannot anticipate a prior patent, although application therefor was first filed.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 77; Dec. Dig. ☜61.]

2. PATENTS ☜328—VALIDITY AND INFRINGEMENT—ELECTRIC CONTROLLER.

The Sundh patent, No. 733,564, for an electric controller or self-starter, while for a new combination of old elements, was not anticipated and discloses invention. Claims 1, 2, 3, 17, and 18 also *held* infringed.

In Equity. Suit by the Sundh Electric Company against the Interborough Rapid Transit Company. On final hearing. Decree for complainant.

Decree reversed, 198 Fed. 94, 117 C. C. A. 280.

William B. Whitney, of New York City, for complainant.

Jones, Addington, Ames & Seibold, of Chicago, Ill., and Leslie R. Palmer, of New York City (W. Clyde Jones and Arthur B. Seibold, both of Chicago, Ill., and Wylie C. Margeson, of New York City, of counsel), for defendant.

HAZEL, District Judge. This is a bill in equity for alleged infringement of patent No. 733,564, dated July 14, 1903, for an electric controller, and granted to August Sundh, complainant's assignor. The apparatus is described as an automatic switch device for a motor starter, or what is known as a "self-starter," by which a plurality of resistance currents are successively automatically cut out and into the circuit of the motor for the purpose of starting or stopping its movement or varying its speed. The invention consists of the combination of elements which are particularized in the claims. The questions presented for decision are whether the involved claims are valid, and, if valid, whether their scope includes the electric controller devices used for operating signals of the New York subway, installed by the J. L. Schureman Company for the defendant Interborough Rapid Transit Company.

To establish infringement, the complainant, out of a total of 19 claims, relies on claims 1, 2, 3, 17, and 18, which read as follows:

"1. An electromagnet, an armature therefor, a shaft, means for rotating said shaft controlled by said armature, a circuit-closing lever, a contact-terminal in the path of said lever, and a cam on said shaft constructed to move said lever to close circuit at said terminal.

"2. An electromagnet, an armature therefor, a shaft, means for rotating said shaft controlled by said armature, a circuit-closing lever, a contact-terminal in the path of said lever, and a cam on said shaft constructed to move said lever to close circuit at said terminal and to retain said lever in said closed position when the rotation of said shaft is arrested.

"3. An electromagnet, an armature therefor, a shaft, means for rotating said shaft controlled by said armature, a plurality of circuit-closing levers, a plurality of contact-terminals in the path of said levers, and cams on said

shaft constructed to move said levers to close circuit at said terminals; the aforesaid parts being timed and constructed to operate said levers to close said circuits successively."

"17. The combination with the solenoid *13*, and its movable core, of the rotary shaft *30*, gearing between said core and shaft for causing rotation of said shaft by said core, pivoted circuit-closing levers *48, 49, 50*, and cams *54, 55, 56* on said shaft; the said cams being constructed successively to operate said circuit-closing levers *48, 49, 50*.

"18. The combination with the solenoid *13* and its movable core, of the rotary shaft *30*, gearing between said core and shaft for causing rotation of said shaft by said core, pivoted levers *48, 49, 50,* and *62*, circuit-terminals in the path of said levers and cams *54, 55, 56*, and *74* on said shaft; the said levers and cams being constructed and timed so that said levers *54, 55*, and *56* are successively actuated by said cams to close circuit and the lever *62* to open circuit."

Claims 1, 2, and 3 are broadly for a switching mechanism, which may be applied to various uses, and which includes: (1) an electromagnet (of the solenoid type); (2) an armature therefor (a core or plunger); (3) a shaft; (4) means for rotating the shaft controlled by the armature; (5) a lever for closing the circuit; (6) a contact terminal; (7) a cam on the shaft adapted to move the lever to close the circuit at the terminal.

Claim 2 is not materially different from claim 1, but specifies the function of the cam. Claim 3 includes a plurality of circuit-closing levers with corresponding terminals and arms on the shaft positioned to operate the levers in such a way as to close the circuit successively. Claims 17 and 18 particularize the elements of the combination and refer to them by the drawing numbers. The specification in detail and at length describes the manner in which the motor is started, with the resistance in the circuit, and such description, omitting immaterial portions, is well stated by counsel for complainant as follows:

"Briefly stated, the throw of a hand switch closes the circuit through the upper winding of a double solenoid, which, when energized, draws up its core and closes the main switch in the motor circuit and thereby starts the motor, with all the resistance in the circuit. At the same time the lower winding of the solenoid is energized, and, drawing up its core against the retarding action of a dash-pot, by means of a rack cut along the back of the core and meshing with a pinion on a cam-shaft, causes the rotation of the shaft, whose cams act successively on the arms of a series of pivoted lever switches, making 'butt' contact with a series of fixed contact terminals, to close these switches one after another, and thereby short-circuits and cuts out step by step the sections of resistance (and with the last section the series field winding of the motor), and gradually brings the motor from rest up to a condition of full speed. Finally, the last cam on the shaft to operate throws open a normally closed lever switch in the circuit of the lower solenoid winding and cuts out that winding; but its core is held in its elevated position, at the top of its upward movement, by the upper solenoid winding, and in turn holds the cam-shaft so that its cams will maintain the switches in position, the resistance switches closed, and the solenoid circuit switchs open. When it is desired to stop the motor, the hand-switch is opened, whereupon the core of the lower solenoid winding drops by gravity, rotating the cam-shaft back to its initial position and allowing a spring to close the solenoid circuit switch, and the resistance switches to fall back to open position by gravity, and then the core of the upper solenoid winding drops."

According to the specification the resistance switch levers are of magnetic material, each having an electromagnet in its path, which is

energized with the lower solenoid winding. Such levers, however, are not in the magnetic field or influenced by the electromagnets when in an open position, but when they travel inward or towards the fixed contact they come within the magnetic field and are quickly attracted to butt against the terminal contact, thus closing the circuit. It should be understood that the cams on the shaft are arranged to cut out the electromagnets whenever the cam on the shaft breaks the solenoid circuit. The specification, speaking of the arrangement of the cams, says:

> "It will be seen, therefore, that through the action of the several cams, the timing of the apparatus is such that the levers 50, 49, and 48, successively establish their contacts with the plates 59 and then the lever 62 is moved away from its contact-plate by the action of the cam."

Importance is attached to this feature and to the action of the cams, which, after making contact and after the motor is rotated at full speed, holds the switches in contact mechanically without the expenditure of current energy. The advantages claimed for the self-starter are that they may be started or stopped by merely pushing a button, or inserting a plug to make switching contact or by other means, without, however, any manual effort. For instance, the claim is that, in motors used to drive pumps and to keep a tank filled to its capacity with water, it does not during the pumping operation require the presence or activity of any human agency. It is frankly admitted that none of the elements of the claims in suit are new, and that the claims 1, 2 and 3, if construed broadly without regard to the specification, would not be sustainable in view of the prior patents to Thomson-Houston Company (British) No. 18,617 of 1900, Sinclair No. 566,874, Herrick No. 507,125, Parker No. 531,961, Bell No. 738,281, and other patents to which counsel for the defendant directs attention, viz., patents to Richardson, Ihlder, Piatt, and Herdman.

The element of a starter for a motor aside from the switching mechanism is not specified in any of the claims in issue, and yet the unqualified contention of the defendant that such feature cannot be considered to prevent anticipation is not thought sound. The specification and evidence show that the switching mechanism and the arrangement of the parts by which their co-operation is secured possessed such original characteristics that for the first time means were provided in electric controllers of rotary shaft type to start the motor automatically and move the levers to close the circuit. It may be conceded that claims 1, 2, and 3, if given an unqualified construction, are lacking in novelty when standing alone and unassociated with the arrangement of the parts by which the mode of operation was secured to achieve the result. All of the elements of the combination may even have heretofore been combined in similar structures to perform the functions expected of them, but in considering whether invention was involved in the combination in suit it is important to ascertain whether such old elements have not been combined by the patentee in a new and unusual way to accomplish a result not hitherto attained. The scope of the claims, it is true, must be ascertained from their wording, and it is quite proper to examine the specification and drawing and the state of the art to ascertain the principle of operation of the in-

vention—not to add or vary the claims, be it understood, but to arrive at a better understanding of their meaning. White v. Dunbar, 119 U. S. 47, 7 Sup. Ct. 72, 30 L. Ed. 303. Therefore the claims must be limited to the actual combination of elements which are assembled or correlated in a new way to secure a distinct co-operation and result. Thus limited, none of the prior patents in evidence are thought anticipatory.

The crucial question resolves itself to this: Did it involve invention at the date of the Sundh application to gear the electromagnetic engine in the form of a solenoid, having a core and dash-pot, to the cam shaft of the lever to make butt contacts with the co-operating fixed contact terminals in such a way as to automatically start the motor and move the levers successively? It was old in the art to use a solenoid and core in co-operation with a dash-pot and shaft to move or automatically slide a contact arm over a series of fixed contacts. But in the earlier devices the starting was by hand lever or rope to raise fixed weights or actuate a spring to move the switches. Such a combination of elements the patentee designed to improve by combining them differently. Other patents introduced in evidence by the defendant show drum type structures which in operation also make sliding contacts with spring-pressed contact terminals, and another type of starters wherein the movable contacts are actuated one after another by a revolving cam shaft or a reciprocating cam belt such as shown and described in the patents to Eaton, No. 685,326, and to Liggett, No. 731,375. In the Eaton patent, which employs a gravity engine, the shaft is rocked by hand in each direction, and as the shaft is rocked it lowers a cam to connect with the switch levers for the purpose of cutting out resistance. The cams, it is true, are placed in relation to each other as to time and operation, but the motor is started manually, and therefore does not anticipate the patent in suit. So in the Liggett patent the cam shafts are rotated by hand rope or cable, which controls the main and reversing switch mechanism. Although such method of operation includes in its elements a plurality of stationary contacts connected with the armature resistance of the motor and a plurality of pivoted levers to control the resistance of the cam type switching mechanism, it does not limit the claims in suit.

Stress is laid by the defendant on the Richardson patent, which has a plurality of cams on the shaft, one for each lever, to operate them successively and to close the circuit. The specification shows that a weight in its descent actuates the cam shaft so that it makes a partial revolution, and another cam actuates the pivoted switches which have the characteristic of turning on and off electric lights. There is no gearing between the core and shaft to rotate the latter. The arrangement of the core on the solenoid with its retarded movements by the dash-pot is essentially different, and in view of the state of the art was not the equivalent of the Richardson means for actuating the switches. The Ihlder patent, No. 742,031, filed June 10, 1902, is unquestionably the defendant's best reference, and it so closely resembles the Sundh patent in suit that the supposition arises that both Ihlder and Sundh were engaged at the same time in solving the problem and

each invention performs substantially the same function. Like the patentee here, Ihlder combined the solenoid engine with its core and dashpot of the switching mechanism; each lever is provided with a cam plate to make a butt contact. Ihlder adapted his switching mechanism to a reciprocating cam, and he actuates his switch levers in pairs and not separately, as does the complainant.

[1] But such patent does not anticipate the patent in suit for the following reasons: The Ihlder and Sundh applications for patent were pending in the patent office at the same time, Ihlder application being filed first, and patents were thereafter granted on both applications, to Sundh first and later to Ihlder; and hence such later patent was not of the prior art and cannot negative the novelty of the claims in suit. This point has been passed upon in several prior adjudications. Bates v. Coe, 98 U. S. 31, 25 L. Ed. 68; Diamond Drill & Machine Co. v. Kelly Bros. (C. C.) 120 Fed. 282; Thomson-Houston Elec. Co. v. Ohio Brass Co. (C. C.) 130 Fed. 542; Eck v. Kutz (C. C.) 132 Fed. 758. In Thomson-Houston Electric Co. v. Ohio Brass Co., supra, Judge Hale said:

"References are also made to certain patents which are subsequent to those in suit, although their applications appear to have been filed prior to the issue of these patents. The study of the prior art in a patent case is necessary in order to prevent the unlawful appropriation of the invention of another, when that invention had become public. An application prior to the patent in suit can have weight only if there has been some actual use of the invention, so that there may be elements of publicity. Such an application cannot be said to be a part of the prior art unless this element of publicity is present."

It is not claimed that the invention described in the invention of patent No. 742,031 was in prior use or known to the public, and accordingly such invention cannot be considered to anticipate the patent in suit.

Referring again to the question of novelty, the defendant contends that the primary object of the Sundh patent was to devise means for quickly closing the contacts and to close the circuit and snap the levers by the magnetic attraction; that the mechanism of Sundh was merely to start the levers in their movement, and not to complete the movement to the contact terminal; that if the claims were considered broadly, and without reading into them the snap action feature, they are anticipated by Herrick, Parker, and Richardson. But to this view I withhold my assent. The claims in issue speak of the cams moving the lever to close the circuit, and such words cannot be reasonably restricted to a mere starting movement. The specific feature by which the levers come into the magnetic field of the electromagnets to rapidly complete the movement by snap action are features included in other claims. The patentee was not obliged to include a specific element in the claims in issue to impart novelty to them. McCarty v. Lehigh Valley R. R. Co., 160 U. S. 110, 16 Sup. Ct. 240, 40 L. Ed. 358: Los Angeles Art Organ Co. v. Æolian Co., 143 Fed. 880, 75 C. C. A. 88.

Nor am I impressed by the argument that what Sundh did was open to him and was merely a matter of selection of old elements from other manually operated switches, such as were claimed to have been operated

automatically or semiautomatically. The vast number of prior patents in evidence in support of the claim of anticipation is persuasive testimony that the claims were for an actual combination, and that there was invention in assembling the elements so as to change the hand-starting device into a device which automatically opens and closes the switch mechanism. It was not merely transforming the hand lever switching mechanism of Eaton and Liggett, by adding or substituting a reciprocating solenoid. On the contrary, to effect a reorganization of such prior devices it was necessary to change or remove portions of their mechanisms, and gear the core of the solenoid to the cam shaft, by which not only the switch levers were actuated, but by which successive contacts were made. This may not now be regarded as of troublesome consummation. The earlier patents indicate that the skilled in the art were striving to perfect an automatic starter. It was in their minds to do so, and they tried and failed, leaving it to Sundh to successfully solve the problem.

[2] As to infringement: The switch levers, 11 in number, of the defendant's device, are mounted on a switchboard and the essential elements are associated together in such a way as to make butt contacts with fixed contact terminals arranged in the path of each lever; such levers being successively actuated by suitable cams mounted on a cam shaft. An electromagnet of the solenoid type, together with its core, gives rotary motion to the cam shaft. In the back of the core there is formed a rack which engages a gear wheel mounted on a cam shaft. The switch levers on the right side of the device are normally held in a closed position by springs, and are moved away from their contact terminals to open the circuit by the cams, while the others, the resistance switches, are normally held open by gravity and close the circuit by gravity, but remain closed by the action of the cams. In short, the defendant uses an electromagnet, an armature, a shaft, and means for rotating such shaft similar to that of complainant. It has circuit-closing levers, similar to those of complainant numbered 48, 49, and 50 in the drawing, and contact-terminals, and a cam on said shaft co-operating to close the circuit at the terminal contact. The defendant's arrangement of its series of circuit-closing levers is such as to enable closing the circuit successively. It does not use electromagnets to snap the levers, and although there are differences of construction as to the form of the levers and contacts, such differences are immaterial, in view of the fact that the essential elements by which the result is achieved are combined by it in substantially the same way to secure a result similar to that attained by the complainant and as specified in the claims in controversy.

It follows that the defendant infringes such claims, and the complainant is entitled to the relief prayed for in the bill, with costs.

So ordered.