NATIONAL CHEMICAL & FERTILIZER CO. v. SWIFT & CO.

(Circuit Court of Appeals, Seventh Circuit.   October 2, 1900.)

No. 674.

PATENTS—NOVELTY—FERTILIZER FROM CONTENTS OF TANK-WATERS.

The Van Ruymbeke patent, No. 367,732, for a fertilizer described in the claim as a "nitrogenous fertilizing material consisting of the undecomposed coagulated albuminoids of concentrated tank-waters, freed from undue deliquescence and viscidity," is void for lack of novelty, the same product, prepared by substantially the same chemical treatment of tank-waters, having been disclosed in a number of prior patents.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

The decree appealed from dismisses the bill of complaint for want of equity, and is based on the opinion of the trial court that the patent in suit is invalid both for uncertainty and for lack of novelty.   100 Fed. 451.   The bill alleges infringement of letters patent No. 367,732, issued to the appellant, as assignee of Joseph Van Ruymbeke, August 2, 1887, for a fertilizer.   The original application was filed July 27, 1885, and called for a patent for the process described: but this was refused by the patent office for sundry reasons stated by the examiners, including the following: That "there is no specific process described"; that "neither the specifications nor the claims" comply with the law; and that "many other inventors have treated the same and similar material to that of the applicant with the same chemicals."   Thereupon, the application being changed to one for the product, the patent was finally allowed for "certain new and useful improvements in fertilizers," with the following specifications and claim:

"Liquids technically known as 'tank-waters,' produced by the rendering of meats and fatty substances, contain so much of soluble gelatinous substances that, when evaporated, the product is so sticky and deliquescent that its utilization as a fertilizer has been abandoned.   My present invention consists in the production from tank-water of a fertilizer free from undue deliquescence and viscidity, which I accomplish by rendering insoluble the gelatinous substances contained in these waters without the loss of any of the solids in solution, and without the transformation of them into several different products, each of which products requires to be differently and separately treated for utilization, as is the case when the stickiness is corrected by heat.   In my method of making this new fertilizer by rendering insoluble the gelatinous substances contained in these liquors I preferably use a solution of sulphate of iron, and, for the purpose of ascertaining the minimum quantity to be used, I determine, first, the specific gravity of the liquid to be treated; secondly, the proportion of gelatinous substances which it contains.   The class and character of the meats rendered and the tank-water therefrom vary so much in the relative proportions of fibrine and gelatine which they contain that it is necessary to make a chemical test of a sample of tank-waters about to be treated.   This test consists in gradually adding to such sample of tank-water a solution of iron of known strength; and in my experience I have found that for one hundred parts of solids in solution in the tank-water it requires from fifteen to twenty per cent. of green copperas, which is added in solution to the tank-water, and mixed thoroughly therewith.   This compound is then evaporated under 250° to 300° Fahrenheit, preferably by steam, after which it is placed in an open vessel, in thickness of one inch, and for a period of about ten hours is subjected to a heat of about 350° Fahrenheit, when it will become hard, brittle, and easy of pulverization.   The heat should not be raised much higher than 350°, because the material would thus again become sticky, blacken, and suffer loss of ammonia.   By this means the substances in solution in the tank-waters, with all the nitrogen they contain, are preserved in the resulting non-viscid, nondeliquescent fertilizer, rich in nitrogen, with soluble phosphate and potash.   Instead of using sulphate of iron, as an equivalent I may use the same pro-

portions of chloride of iron, sulphate of aluminum, alum, acetate of lead, or other soluble salts of iron or aluminum, or twenty to thirty per cent. of organic tannins, or five to ten per cent. of chlorine or its equivalent hypochlorides. These are the proportions when either class of these chemicals is used alone, but, if used in combinations, equivalent proportions of each will take the place of the others. I am aware that the described chemical ingredients have been used in the treatment of sewage and similar liquids, but such use has been for the purpose of preventing odorous decomposition, and not for rendering insoluble gelatinous compounds, such liquids not usually containing gelatine. Having described my invention, what I claim is: The within-described nitrogenous fertilizing material, consisting of the undecomposed coagulated albuminoids of concentrated tank-waters freed from undue deliquescence and viscidity."

The appellee, Swift & Co., is operating as licensee under letters patent issued to Omar T. Joslin, April 11, 1893, for a "process of making fertilizer from tank-water"; and the following is stipulated as the process actually employed by the appellee, in conformity with such patent, producing the fertilizer which is alleged to infringe the appellant's patent:

"The tank-water is first concentrated to a consistency of about thirty-five degrees Baumé, at a temperature of 140 degrees F. The resultant product is called 'stick.' To the stick there is added two per cent. of sulphuric acid of from sixty to sixty-six degrees strength. The mass is then stirred for a few minutes to allow decomposition to take place. There is then added in solution enough sulphates formed by dissolving waste fuller's earth in sulphuric acid so that on completion of the process the finished product will contain, on dry basis, eight per cent. of such sulphates. The mass is then stirred about ten minutes. Pressed cooked blood is then added until the finished product will contain, on dry basis, seventeen per cent. of blood, and the mass is stirred about ten minutes. The product is then finished by drying in shallow pans in a steam oven. This process is sometimes varied as follows: As a substitute for the two per cent. of sulphuric acid there is sometimes used an equivalent quantity of waste sinews or ligaments from slaughtered animals, dissolved in sulphuric acid. Another change is that, as a substitute for the pressed cooked blood, there is used about half the quantity of blood, and the deficiency is supplied by using steamed hoofs, the quantity of each and either depending upon the supply of either or both on hand; but usually there is a sufficient quantity of hoofs used so that the finished product will contain from eight to twelve per cent. of hoof, on dry basis."

In support of the defense of anticipation in the prior art, numerous letters patent of the United States were introduced, and the following are specially referred to and discussed in the testimony of the experts: Gale's, No. 38,040, for an "improvement in treating phosphatic guanos"; Wilson's, No. 90,328, for an "improved process of treating offal-gelatine and scrap for the manufacture of fertilizers"; Stephens', No. 144,877, for an "improvement in the manufacture of fertilizer by using plaster of Paris with animal matter"; Shaw's, No. 146,285, for treating slaughter-house wash for a fertilizer; North's, No. 165,172, for an "improvement in fertilizers"; Halverson's, No. 171,613, which distinctly claims "the improved process of utilizing 'soup' described, consisting in treating the same with persulphate of iron"; Terne's, Nos. 228,955, 246,242, 269,487, 282,411, relating to the treatment of sewerage and tank-waters; Huet's, No. 242,777, for treatment of animal substances, etc., for making a fertilizer; Myerson's, No. 163,099, and Strype's, No. 318,826, for treatment of blood; also several patents issued on applications of Joseph Van Ruymbeke, both prior and subsequent to the patent in suit, for the treatment of tank-waters to produce fertilizers.

L. L. Coburn, for appellant.

J. L. Jackson and L. L. Bond, for appellee.

Before WOODS and GROSSCUP, Circuit Judges, and SEAMAN, District Judge.

SEAMAN, District Judge, after making the foregoing statement, delivered the opinion of the court.

The appellant's patent, issued on the application of Joseph Van Ruymbeke, is for a product stated in the single claim of the patent as a "nitrogenous fertilizing material consisting of the undecomposed coagulated albuminoids of concentrated tank-waters freed from undue deliquescence and viscidity." The validity of the patent rests primarily on the assumption that Van Ruymbeke made the discovery of a new composition of matter; that, utilizing the waste tank-water which came from the rendering operations of slaughter houses, he produced a valuable fertilizer, through chemical action theretofore unknown. The process employed is not protected by patent, as the application for that object was rejected by the patent office; but the patentee is, nevertheless, entitled to the broader protection of his product for which the patent was finally allowed, if it be true that it is his discovery in the sense of the patent law, provided the means and method of production are clearly set forth. When a new article, a new property in the composition of matter, is thus brought to light for the enrichment of the world's knowledge and uses, the statute intends that the discoverer may be rewarded with exclusive rights to make and sell the article during the moderate term for which the patent is granted; and, as remarked in Merrill v. Yeomans, 94 U. S. 568, 571, 24 L. Ed. 236, this right prevails over an infringing article, "however produced." This broad monopoly can be granted for a true discovery only, and not for the mere improvement of a known composition. The "mere carrying forward, or new or more extended application of the original thought; a change only in form, proportions, or degrees; the substitution of equivalents, doing substantially the same thing in the same way by substantially the same means, with better results,—is not such invention as will sustain a patent." Smith v. Nichols, 21 Wall. 112, 119, 22 L. Ed. 567; Grant v. Walter, 148 U. S. 547, 553, 13 Sup. Ct. 701, 37 L. Ed. 557. And this rule is strictly applicable where the claim of the patent is for a new substance or composition of matter.

The contention on behalf of the appellant is thus stated in the brief of its counsel:

"Dr. Van Ruymbeke, the patentee, made a discovery in chemistry, to wit, that the application of sulphate of iron or green copperas would coagulate the gelatinous substances or albuminoids of the solids held in solution in 'tank-water,' which enabled him to utilize all of the solids in tank-water by evaporation, and render them non-viscid and non-deliquescent, without applying a high degree of heat. By this process he made a waste product valuable, and corrected the sanitary conditions surrounding all the packing houses."

If the testimony sustains this contention within the rules above indicated, the patent is sustainable, unless the description of the process is fatally defective; and in that view it would be questionable, to say the least, whether substantial difference in the appellee's process would save its product from infringement. The nature of the discovery must, therefore, be ascertained in the light of the prior state of the art. As usual in the expert testimony furnished in patent causes, the opinions of the chemists called on one side and the

other—including scientists of eminence in the profession—are directly opposed on the question whether Van Ruymbeke made a new discovery in chemistry; but we are of opinion that the various suppositions upon this point founded upon theories are set at rest by the evidence of prior patents and publications and of practical demonstrations thereunder. "Tank-water," which is the subject of the treatment described in the patent, is the name applied in the slaughter-house industry to the liquid produced in the rendering of meats and other animal matter through the process of subjecting such material to the action of steam and pressure. The fat rising to the top of the tank, and the undissolved solid matter settling to the bottom, the fluid which remains between them is known as tank-water, sometimes called "soup," and contains about 10 per cent. of solids in solution. In this condition the tank-water is both waste material and unsanitary. It is described by the experts as "an exceedingly complex substance," many of the constituents being unknown; but the presence of albuminoids and gelatinous substances was well known, although their exact nature and extent is still unknown; and these constituents are rich in nitrogen, and valuable as plant food. This tank-water has long been subjected to treatment which reduced it to a substance called "stick," with varying consistency, approximating 50 per cent. solids; and the stick, when further evaporated to dryness, at a temperature of about 212° Fahrenheit, possessed fertilizing properties of great richness, but was then defective for commercial use by reason of its extreme deliquescence, namely, having the property of absorbing moisture from the atmosphere so that it soon became sticky and viscid, "flowing like tar." The process described in the Van Ruymbeke patent overcomes this serious defect through the chemical action of a solution of sulphate of iron, or some of its numerous equivalents, and thus produces a fertilizer ingredient of great commercial value. Was it a "new discovery in chemistry" that a remedy existed in the use of such chemical agent under like conditions, that sulphate of iron, or known equivalents, "would coagulate the gelatinous substances contained in tank-water"? The answer to this crucial inquiry must be sought in the prior patents introduced in the record, and we are constrained to the opinion that they clearly negative the appellant's contention.

The application for the process of the patent in suit was filed July 27, 1885. (1) In 1863 letters patent No. 38,040 were issued to Gale for a process of making a fertilizer by combining phosphatic guano "with animal matter previously converted into ammoniacal products"; and for the treatment of the latter distinctly specifies the use of copperas (sulphate of iron), with a small proportion of sulphuric acid, and then boiling down the mixture "until the animal matter shall be broken down, and reduced to a gelatinous mass." These ingredients and the method set forth are quite identical with those employed by the appellee in the treatment of tank-water. (2) In 1869 letters patent No. 90,328 were issued to Wilson "for a process of treating offal gelatine and scrap for the manufacture of fertilizers," and the specifications show that the treatment is applied to the same material which is here called tank-water, together with such solids as

remain after drawing off the fat. The ingredient named for the mixture preparatory to concentration by heat is acid phosphate of lime, but salt of iron is also mentioned in language which would imply either additional or alternative use, or, as stated in the second claim of the patent, for application "separate or combined"; and the patentee says he thus overcomes "the well-known gummy and sticky property of commercial phosphate fertilizers." (3) The Stephens patent, No. 144,877, of 1873, clearly describes a process for treatment of tank-water which is identical with that of the patent in suit, except that plaster of Paris (sulphate of calcium) is used instead of sulphate of iron; and the qualities of the product are described in terms which cover the Van Ruymbeke claim. (4) In 1875, however, letters patent No. 171,613 were issued to Halvor Halverson with a single claim for "the improved process of utilizing 'soup' described, consisting in treating the same with persulphate of iron." The specifications unmistakably show that tank-water was the subject of treatment, with the twofold purpose of obviating its "injurious sanitary effects," and "converting the same into fertilizing material"; that it is treated with "a saturated solution of persulphate of iron until precipitation ceases, the precipitate thus formed being not only valuable as a fertilizer, but also, by subsequent treatment, for edible purposes." Whether the specifications of the process are open to the objection made that they are indefinite in respect of proportions of material and of the treating or boiling for concentration, is not essential to the question under consideration, as they furnish a clear disclosure by publication of the identical idea of means claimed in the appellant's patent; the use of the chemical reagent and its effect upon the gelatinous substances in the tank-water thus being distinctly pointed out. Given, through such publication of the processes in the prior patents, like ingredients, with coagulation of the albuminoids and resultant product clearly set forth, there was surely no pioneer discovery in chemistry on the part of Van Ruymbeke to authorize a patent for the identical product, however meritorious his advance may have proved in the process to that end. Moreover, the sample which was introduced of the product made in conformity with the Halverson patent presents every quality described in that of the Van Ruymbeke patent, and the exhibits made thereunder, differing only in color; and the same remark applies substantially to the sample made under the Wilson patent.

Of the other prior patents in evidence it is sufficient to remark that cognate use of sulphate of iron, or its well-known equivalents, for like purpose, appears in Shaw's No. 146,285, Terne's No. 228,955, and Huet's No. 242,777; that in Myerson's No. 163,099, and Strype's No. 318,826, salts of aluminum are alike employed to coagulate blood; and that North, in No. 165,172, treats tank-water by a high degree of heat, and describes the fertilizer thus produced as "not at all viscid, but brittle, and only slightly deliquescent." The contention that these prior patents must be treated as failures—as mere paper patents of no practical value—is untenable. "The very fact" of the grant of a patent for the process described "is some evidence of its operativeness, as well as of its utility," when introduced by way of anticipation

(Dashiell v. Grosvenor, 162 U. S. 425, 432, 16 Sup. Ct. 807, 40 L. Ed. 1029), and the testimony which was offered to overcome their presumptive value relates only to the patents of Halverson, North, and Terne. That referring to the Halverson process is entirely hearsay, and inadmissible; that as to the trial of the North process merely states the conclusion of the witness that "it was not practical," without explaining the circumstances; and finally, in reference to the Terne patents, which are owned by the appellant, its president states that they produced under them "a commercial fertilizer," which he does not attempt to differentiate from the product in suit, but says "the process could not be made profitable," leaving the cause unexplained. Thus standing unimpeached each of the patents in evidence is entitled to consideration, with its value dependent alone upon the identity and completeness of the means and results described, and with substantial identity of the Terne product conceded by fair implication. It is true that the testimony further shows that prior to the introduction of the Van Ruymbeke process the tank-water produced in slaughter houses was not successfully utilized, and that success, in fair measure, at least, followed its adoption in the development of an important industry. But it appears equally true that the industry cannot be conducted with profit, except in connection with the great packing establishments having an output of upwards of 1,000 hogs per day,—a condition which was not met by more than three concerns in the United States prior to the date of this patent. The magnitude and diversity of packing operations at great centers have greatly increased since that date, while comparatively few establishments are thus utilizing their tank-water. Whether the success of the operation under the patent in suit is due to the superiority of its process for economical production, or to the changed conditions referred to, or to both combined, is not material, in view of the fact that the product, and not the process, is the claim of discovery. We are of opinion, therefore, aside from other questions which are argued in their briefs, that no discovery was made by Van Ruymbeke to authorize a monopoly of the product described, and that the bill was rightly dismissed for want of equity. Accordingly, the decree of the circuit court is affirmed.