ZIMMERMAN et al. v. ADVANCE MACHINERY CO.

(Circuit Court of Appeals, Sixth Circuit. April 10, 1916.)

No. 2719.

1. PATENTS ⬦⟲328—INVENTION—PROCESS OF CONVERTING GLUE.

The Zimmerman patents, No. 961,058 and No. 1,009,616, each for a process for melting or converting glue, *held* void for lack of invention in view of the prior art.

2. PATENTS ⬦⟲36.—INVENTION—PRIOR PATENTS.

The question whether a patent involves invention is one of fact, to be answered in the light of all pertinent considerations, including the prior art, and although a process patent is not completely anticipated by any

single prior patent, all prior patents containing elements of the process are to be considered in determining the question of invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 40; Dec. Dig. ☞36.]

Appeal from the District Court of the United States for the Northern District of Ohio; John M. Killits, Judge.

Suit in equity by Charles M. Zimmerman and the Instantaneous Glue Converter Company against the Advance Machinery Company. Decree for defendant, and complainants appeal. Affirmed.

W. F. Murray, of Cincinnati, Ohio, for appellants.

Owen, Owen & Crampton, of Toledo, Ohio (Wilber Owen, of Toledo, Ohio, of counsel), for appellee.

Before KNAPPEN and DENISON, Circuit Judges, and SANFORD, District Judge.

KNAPPEN, Circuit Judge. Suit for infringement of patents to Zimmerman, No. 961,058 (June 7, 1910) and No. 1,009,616 (November 21, 1911), on process for melting or converting glue. The process of the first patent is best shown in connection with the drawing of the apparatus referred to by the inventor as suitable for carrying out his process, which drawing (reduced) we here reproduce:

Glue (previously dry) soaked "in a predetermined quantity of cold water until all the water has been absorbed by the glue and the glue has been reduced to the form of lumps of jelly" is placed within the drum B, contained within the cylindrical chamber A, which is open at its upper end. Steam injected through an opening c in the supply pipe E (fed by a steam pipe E') is made directly to contact with and permeate the cold glue-jelly which rests upon the bottom C of the drum B, this bottom being so constructed, by perforations or otherwise, as to support the jelly and at the same time permit the melted glue to run through, whereupon it passes through the funnel-shaped portion B' below the perforated bottom C and into a collecting trough D, from which the melted glue is drawn off through the pipe D'; the water resulting from condensation of the steam, and collected in the trough a'', is conducted by the pipe b to a point near the bottom of the chamber A, whence it escapes through the pipe F.

The first patent has six claims, all of which are in issue. The first reads:

"1. *The process as herein described of converting glue into liquid form, which consists in soaking the dry glue in a predetermined amount of water to form a jelly,* and subjecting the jelly to the action of steam."

The second claim differs from the first only in omitting the limitation upon the water used for soaking the glue to "a predetermined amount," and in subjecting the jelly to the action of steam "in a closed chamber." Each of the claims contains the words in the first claim which we have italicized, with the limitation above stated as to the second claim. Each of the claims (except the fifth) provides for "subjecting the jelly to the action of steam," or for "passing steam throughout the mass of jelly," or for "passing steam through the body of the jelly so as to cause it to attack the jelly on all sides and thoroughly permeate the same." The fifth claim omits all mention of the steam, and so fails in terms to disclose a complete process. The third contains the element of collecting the liquid glue as it runs through the perforations of the support; the fourth the catching of the water of condensation to prevent its mixing with the liquid glue; the fifth and sixth cover both the last-named elements, although in slightly different verbiage.

The process of the second patent differs from the first only (a) in that, as stated in the specification, but not in the claim, the dry glue is soaked in the converting vessel (afterwards put into the converter) —so saving the removal of the jelly from the vessel in which it is formed, as in the process of the first patent—and (b), as stated in both specification and claim, in adding to the dry glue "as much water as the glue can take up" instead of "a predetermined amount of water," as in the specification and certain of the claims of the first patent. The single claim of the second patent reads thus:

"The herein described process of melting glue, which consists in adding to the quantity of glue to be melted, as much water as the glue can take up in passing into jelly form, and after the glue has been thus converted into a jelly, melting the jelly by subjecting it directly to steam."

The defenses are invalidity of the patents and noninfringement. On final hearing on pleadings and proofs, the District Judge held both patents invalid and dismissed the bill, which contained also a charge of unfair competition not now in the case.

[1] When Zimmerman entered the field it had for many years been common practice to form glue into a jelly by soaking in water before applying heat for melting. Indeed, this practice is expressly recognized by the inventor in the specification of his first patent. In the woodworking art it had been the practice to melt the glue jelly by means of a jacket of hot water or steam, or both, enveloping the jelly-containing vessel. Zimmerman claimed an improvement over this method in saving not only the time required to melt the glue, but deterioration of the glue in both strength and quality, due to the superheating, under the old process, of the portions of the jelly next to the heating jacket of its container, the evaporation of water in the glue, and the necessity of having a supply kettle with a quantity of glue under constant heat. There is no room for dispute that in the glue-melting art every

element of the process of Zimmerman's first patent was old.   In making glue for coating and sizing paper, and for sticking the coloring material to paper, it was common practice to soak the glue in water until it jellied, and then to melt the jelly by the direct application of steam thereto while contained in the soaking vessel.   In making glue for the manufacture of printers' rollers Bingham, by patent No. 412,720, had, in 1889 (21 years before Zimmerman) disclosed a process by which the glue, suspended in open-work trays of wire cloth or perforated metal, or other like construction, and contained within an enclosing cylinder, was subjected, through the open-work of the top, bottom and sides of each of the trays, to the direct action of steam, which permeated the mass of glue and melted it, the melted glue passing through the openings in the trays into a funnel-shaped bottom, from which it was conducted into an appropriate receiver—the water of condensation being prevented from mixing with the glue, and collected and conducted away by a drain pipe.

Rowe, by patent No. 631,327, had, in 1899 (more than 10 years before Zimmerman) disclosed a process for melting glue, also for manufacturing printers' rollers, differing from Bingham's process in that the glue was exposed to the direct action of the steam while contained in a revolving, perforated cylinder enclosed in a casing.   The molten glue dripped from the revolving cylinder upon inclined plates.   There was an outlet pipe for the melted glue, as well as troughs for collecting and a pipe for discharging the water from condensed steam.   Bingham in actual practice, although not disclosed by his patent, soaked the glue in water before putting it into his open-work trays for subjection to the steam action; he testified that the soaking process was not referred to in the patent because "that was the only method of melting glue that I knew of"; that he had never heard of glue being melted in a dry state.   "All the glue melting I ever knew of in our business, was that of glue that had previously been soaked in water, and it was to melt the glue thus prepared, that this machine was, to be used."   The record contains nothing to discredit this statement, and it must be accepted as true.   In converting raw glue material into liquid glue, to be formed into the dry commercial product, it was common practice to subject the raw material, after first soaking it in water, to the direct action of steam.

[2] The question is not whether the patents in suit are directly anticipated by either of the prior patents mentioned, but whether in view of the prior art the patents involve invention.   This question of the presence or absence of invention is one of fact, to be answered in the light of all pertinent considerations.   Herman v. Youngstown Car Mfg. Co. (C. C. A. 6th Cir.) 191 Fed. 579, 112 C. C. A. 185; Ferro Concrete Co. v. Concrete Steel Co. (C. C. A. 6th Cir.) 206 Fed. 666, 668, 124 C. C. A. 466; Loose Leaf Co. v. Loose Leaf Binder Co., 230 Fed. 120, 144 C. C. A. 418 (decided by this court December 15, 1915).

Referring to the first patent: As already shown, the prior art of melting glue embraced every feature of the process disclosed.   True, the fact alone that each feature of a process is old is not enough to invalidate a patent therefor; the order in which the steps of the process are taken is necessary to complete identity (Expanded Metal

Co. v. Bradford, 214 U. S. 366, 29 Sup. Ct. 652, 53 L. Ed. 1034), and the process as a whole is to be considered in determining invention. But all prior patents and all elements of the prior art have a bearing upon the question of fact whether there is invention in the process under consideration. The general considerations applicable to combination claims are pertinent. For the rule relating to such claims see Keene v. New Idea Spreader Co., 231 Fed. 701, —— C. C. A. —— decided by this court March 17, 1916. And so it is not necessary to a finding of lack of invention that every element of the process be found in one embodiment of the prior art. Bingham, however (assuming that his glue was jellified), disclosed the complete process of Zimmerman's first patent, for Bingham's open-work trays are plainly the equivalent of the perforated drum bottoms of Zimmerman's patent; and the same result is true of the Rowe patent, provided Rowe also soaked his glue before melting, as Bingham said was the universal practice. True, Bingham's soaked glue was of much heavier consistency than the jelly used in the wood-joining art to which Zimmerman's patent is specially applicable (and presumably the same is true of Rowe's glue), because if used in the manufacture of printers' rollers the glue was necessarily thicker than adaptable generally to wood-joining. It is also true that the glue used for coating, sizing and coloring paper was thinner than required for wood-joining; but the art of melting glue for manufacturing printers' rollers and for making coatings, sizings and colorings for paper is not so remote from that of melting glue for the wood-joining art as to make it irrelevant to the question of invention. And there seems no reasonable doubt that Bingham's apparatus at least would convert glue suitable for the wood-joining industry, if the same kind of jelly were used as employed by Zimmerman.

Taking into account the entire prior art, together with the fact that even for wood-joining glue was invariably made into jelly before melting, and Bingham's testimony that "all glue soaked in water is to a certain extent jellified, but the jelly is harder or softer according to the strength of the glue,"·we are unable to escape the conviction that applying Bingham's process (used on his stiff, water-treated glue mass) to the thin glue jelly required for the wood-joining art was not invention, whether or not invention might be found but for the disclosures of Bingham and Rowe. In reaching the conclusion that Zimmerman's first patent did not involve invention, we have not over-looked the consideration that it occurred to no one previous to Zimmerman to apply the processes of Bingham and Rowe to melting glue in the wood-joining art. This fact has a bearing upon the question of invention, as has also the fact of the favorable reception of Zimmerman's patent by manufacturers. But neither consideration is decisive; they are merely aids in determining the ultimate question of invention. We may add that it seems not unlikely that a part, at least, of the favor with which Zimmerman's process has been received is due to the apparatus rather than the process. Plaintiff has a patent upon the apparatus, but that patent is not included in this suit. Whether the feature of storing the melted glue in the converter is or is not valuable is immaterial, for it is included in none of the claims.

As to the second patent: We think we should regard its process as differing from the first patent only in the respect that it calls for "as much water as the glue can take up in passing into jelly form" instead of "a predetermined quantity of cold water." The claim presents no other feature of difference, and plaintiff's counsel claims no other. Zimmerman admits that it was old, prior to the invention of his first patent to soak glue in as much water as it would take up, and that he intended that under the process of his first patent such course should be taken, provided it would give the correct consistency when melted. The change effected by the second patent was not invention over the first patent. Laumann v. Urschel White Lime Co. (C. C. A. 6th Cir.) 136 Fed. 190, 69 C. C. A. 206; Hyde v. Minerals Separation (C. C. A. 9th Cir.) 214 Fed. 100, 130 C. C. A. 576. Moreover, the process of softening glue (before melting) by making it absorb as much water as it will take up had been disclosed in printed publications several years before Zimmerman's second patent. Were we to consider the fact that the process of the second patent contemplated the soaking of the dry glue in the converting vessel, the patent would be equally invalid.

The decree of the District Court is accordingly affirmed, with costs.